UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAVID YOUNG-WOLFF,                              :
                                                :
        Plaintiff,                            : Case No. 12 Civ. 5230 (JPO)
                                                :
   -against-                                   : **NOTICE OF SUPPLEMENTAL**
                                                : **AUTHORITY**
JOHN WILEY & SONS, INC.,                        :
                                                :
        Defendant.                           :
------------------------------------------------------------X

      John Wiley & Sons, Inc. ("Wiley"), through its undersigned counsel, hereby submits as supplemental authority in further support of its motion for partial summary judgment (Dkt. 85) and its opposition to Plaintiff's motion for partial summary judgment (Dkt. 99), the opinion and order of Judge Denise Cote in *Canon Inc. v. Tesseron Ltd.*, --- F. Supp. 3d ---, No. 14 Civ. 5462, 2015 WL 7308663 (S.D.N.Y. Nov. 19, 2015), in which the Court upheld a retroactive license in granting summary judgment in favor of a patent licensee and sublicensee. *Id.* at * 4-8.  In doing so, the Court considered the Second Circuit's opinion in *Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007), a decision Plaintiff Young-Wolff relies upon in his summary judgement papers.

      Judge Cote ruled that *Davis* does not "indiscriminately ban all copyright- or patent-holders, even sole owners, from voluntarily entering into retroactive license agreements." *Canon Inc.*, 2015 WL 7308663, at *6.  To the contrary, "'the holding is a narrow one that does not apply' unless licensing rights are held by co-owners." *Id.* (quoting *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 124 (S.D.N.Y. 2015)).

      A true and correct copy of the decision is attached hereto.

Respectfully submitted,

Dated: New York, New York
December 17, 2015

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By:   /s/   Edward H. Rosenthal
   Edward H. Rosenthal
   Anna Kadyshevich
   Andrew D. Jacobs
488 Madison Avenue, 10th Floor
New York, New York 10022
Phone:  (212) 980-0120
Fax:  (212) 593-9175
erosenthal@fkks.com

*Attorneys for Defendant John Wiley & Sons, Inc.*

2015 WL 7308663
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Canon Inc. and Canon U.S.A., Inc., Plaintiffs,
v.
Tesseron Ltd., Industrial Print Technologies L.L.C., and Forrest P. Gauthier, Defendants.

14cv5462(DLC)  |  Signed November 19, 2015

**Attorneys and Law Firms**

APPEARANCES For plaintiffs Canon Inc. and Canon U.S.A., Inc.: Joseph A. Calvaruso, Lisa T. Simpson, Richard F. Martinelli, ORRICK, HERRINGTON & SUTCLIFFE LLP, 51 West 52nd Street, New York, NY 10019

For defendants Tesseron Ltd., Industrial Print Technologies L.L.C., and Forrest P. Gauthier: Steven C. Schroer, FITCH EVEN TABIN & FLANNERY LLP, 1942 Broadway, Suite 213, Boulder, CO 80302, Jared E. Hedman, FITCH EVEN TABIN & FLANNERY LLP, 120 South LaSalle Street, Suite 1600, Chicago, IL 60603, Cary Kappel, DAVIDSON, DAVIDSON & KAPPEL, LLC, 485 Seventh Avenue, New York, NY 10018

## OPINION & ORDER

DENISE COTE, United States District Judge

This patent infringement action arises out of a licensing agreement in which the patent holder, in exchange for a one-time payment, granted a non-exclusive license that allowed the licensee and the licensee's affiliates to buy and sell the patented goods without restriction. The parties now dispute the effectiveness of a retroactive sublicense that the licensee recently granted to one of its affiliates. Finding that the issuance of a retroactive sublicense does not violate the terms of the licensing agreement, this Opinion grants the licensee's motion for summary judgment.

The patent holders are defendants Tesserson Ltd. ("Tesseron"), Industrial Print Technologies L.L.C. ("IPT"), and Forrest P. Gauthier ("Gauthier"; collectively, "defendants"). They seek a declaratory judgment that the plaintiffs' purported sublicense is invalid as well as damages for the plaintiffs' sale in this country of high speed industrial-sized printing presses manufactured by the Netherlands-based company Océ N.V.,[1] which the defendants assert contain components that infringe the defendants' patents (the "Patents").

[1]  Océ N.V. has since been renamed Océ Holding B.V. Both entities will be referred to as "Océ".

The defendants' licensee is plaintiff Canon Inc. ("CINC"). CINC asserts that, as permitted by its 2006 license agreement with Tesseron ("Agreement"), it issued an oral sublicense to its subsidiary Canon U.S.A. ("CUSA") in 2006. Since the existence of that oral sublicense is a hotly disputed question of fact, CINC recently executed a written sublicense to CUSA ("2015 Sublicense"). This motion practice addresses, inter alia, the retroactive effect of that 2015 Sublicense.

If the 2015 Sublicense has retroactive effect, the plaintiffs contend that the Sublicense covers the purchase and resale by CUSA of Océ printing presses from 2013 to the present. CUSA imported the Océ presses and resold them to its affiliate Canon Solutions America, Inc. ("CSA"). Although a CINC affiliate, and as further explained below, CSA is not an eligible sublicensee pursuant to the Agreement.

Accordingly, CINC asserts that the sales of Océ products in the United States that have been made since 2013—products purchased and imported by CUSA from Océ—are authorized by its Agreement with the defendants and that no additional licensing fees must be paid.[2] The defendants disagree. The critical facts that serve as background to this dispute follow.

[2]  This Opinion does not address any allegedly infringing sales by Océ to the plaintiffs prior to 2013.

## BACKGROUND

The following facts are undisputed, unless otherwise noted. In January 2006, Tesseron and CINC executed the patent licensing Agreement. The Agreement grants CINC a "fully paid-up, nonexclusive, license ... to ... sell ... import ... and/or otherwise dispose of" products related to and derived from the Patents. The license explicitly covers the sales of infringing products to CINC, including claims of infringement against CINC's suppliers arising from the sales to CINC and its authorized affiliates. Section 2.03 states that Tesseron

**\*2** agrees not to assert any of its rights under the Licensed Patents against any direct or indirect suppliers of [CINC] and its Affiliates including, without limitation, Electronics for Imaging Inc.[3] for infringement or alleged infringement ... of any Licensed Patents only to the extent of the Licensed Products which have been purchased by [CINC] or such Affiliates during the term of the Agreement.[4] The Agreement also includes broad releases for CINC, its Affiliates, and their "direct or indirect suppliers," extinguishing past liability for "infringement or alleged infringement ... to the extent of the Licensed Products which have been purchased by [CINC] or such Affiliates at any time prior to the Effective Date." The Agreement identifies the Effective Date as December 31, 2005.

[3] As of the effective date, Electronics for Imaging Inc. ("EFI") supplied printer controller components that CINC was considering using in its own systems in 2005.

[4] "Licensed Products" are defined in Section 1.01 as "<u>any products, devices</u>, apparatus, <u>systems</u>, ... components, subassemblies, subsystems, software programs and/<u>or other items of any form</u>, type or kind, the ... selling [or] offering for sale ... of which would constitute, but for the license granted herein, infringement of any claim of the [Patents]." (Emphasis added.)

The Agreement allows CINC to extend the license to any of its current affiliates and to any future affiliates so long as the future affiliate is not a "major competitor" of Tesseron as of the effective date of the Agreement. The affiliates may not, however, extend additional sublicenses. Specifically, Section 2.02 grants CINC the right, "subject to compliance with the terms and conditions" of the Agreement, "to grant to any ... Affiliates sublicenses under the licenses granted to it under this Agreement but without any right to sublicense further."[5]

[5] "Affiliate" is defined in § 1.01 as "any corporation, company, partnership or other entity (a) which is controlled by or is in common control with Canon directly or indirectly through one or more intermediaries as of the Effective Date" or "(b) which will be controlled by or under common control with Canon directly or indirectly through one or more intermediaries subsequent to the Effective Date and which as of the Effective Date is not a major competitor with respect to the [Patents]."

The Agreement is retroactive, stating that it is effective as of December 31, 2005, and that it extinguishes liability for any claims regarding past infringement. It is governed by the laws of the State of New York. Read as a whole, the Agreement represents a broad grant of rights to CINC and its Affiliates, including releases from liability for their suppliers. The term of the Agreement extends through the life of the Patents.

CINC wholly owns CUSA; CUSA was at all relevant times an "Affiliate" of CINC as that term is defined in the Agreement. Plaintiffs previously offered evidence that CINC orally issued a sublicense to CUSA during a meeting between representatives of CINC and CUSA in Tokyo on January 31, 2006. That sublicense was purportedly retroactive to December 31, 2005. Plaintiffs acknowledge that no documents or other contemporaneous corroborating evidence of this oral agreement have been located. The existence of the oral sublicense presents a disputed issue of fact that may only be resolved at trial. See Canon Inc. v. Tesseron Ltd., No. 14cv5462 (DLC), 2015 WL 4508334 (S.D.N.Y. July 24, 2015) ["Summary Judgment Opinion"].

**\*3** As of December 31, 2005, which is the effective date of the Agreement, Océ wholly owned two subsidiaries: Océ North America Inc. ("Océ NA"), which sold Océ printers in the United States, and Océ-Printing Systems GmbH and Co. ("Océ GmbH"), which designed and manufactured Océ printers. All three Océ entities were major competitors of Tesseron as of the Agreement's effective date. Accordingly, in the event one or more of them ever became an affiliate of CINC, the Océ entities would be ineligible to receive sublicenses under the Agreement.

In March 2010, CINC acquired a majority ownership in Océ, and on January 1, 2013, CINC merged its subsidiary Canon Business Solutions, Inc. with Océ NA, forming CSA. Canon has since acquired 100% control or ownership of Océ and Océ GmbH. Since CSA was created on January 1, 2013, CSA has sold Océ printers to consumers, but has not purchased the printers directly from Océ GmbH. Instead, CSA orders Océ printers from CUSA, which purchases the printers from Océ GmbH.

In January 2014, IPT, the current owner of right and title in the Patents, sued both CUSA and CSA in the United States District Court for the Eastern District of Texas for patent infringement due to the sale of Océ printers through

CSA. On January 27, 2015, the Texas action was transferred to this Court as related to the instant case. Industrial Print Technologies, L.L.C. v. Canon U.S.A., Inc. and Canon Solutions America, Inc., No. 15cv672 (DLC).

Plaintiffs filed the instant action in this Court on July 21, 2014. Their complaint asserts six claims; among others, it asserts claims of breach of contract for improper termination of the Agreement; a declaratory judgment that CUSA holds a valid sublicense under the Agreement; and a declaratory judgment that IPT's patent rights are exhausted with respect to CUSA sales to CSA. Defendants have brought three counterclaims: a declaratory judgment that any purported sublicense to CUSA is invalid; a declaratory judgment that their termination of the Agreement was proper; and a breach of the implied covenant of good faith and fair dealing.

Following the Summary Judgment Opinion's conclusion that the existence of the 2006 oral sublicense between CINC and CUSA presents a disputed issue of fact, CINC and CUSA entered into a written sublicensing agreement with an effective date of December 31, 2005. CINC signed the 2015 Sublicense on September 14 and CUSA signed it on September 16, 2015. Section 2.02 of the 2015 Sublicense purports to "grant[ ] to CUSA, effective retroactively to December 31, 2005," a sublicense with all rights attaching thereto.

On September 23, 2015, the plaintiffs renewed their motion for partial summary judgment to obtain declarations that the 2015 Sublicense is a valid sublicense under the Agreement and that, as a consequence, defendants' patent rights in the products CUSA sells to CSA are exhausted. Plaintiffs also seek summary judgment on defendants' claim of breach of the implied covenant of good faith and fair dealing. The motion was fully submitted on October 16.

On October 23, defendants sought leave by letter motion to file a surreply. In that surreply, they argue that the meaning of the term "supplier" in the Agreement is ambiguous. That argument is addressed below.

## DISCUSSION

The standard that governs a summary judgment motion is well settled. The Court's previous description of that standard is incorporated by reference. Summary Judgment Opinion, 2015 WL 4508334, at *3–4.

The parties contest whether plaintiffs have the right to renew their motion for summary judgment based on the plaintiffs' recent execution of the 2015 Sublicense. "[D]istrict courts enjoy considerable discretion in entertaining successive dispositive motions," Sira v. Morton, 380 F.3d 57, 68 (2d Cir.2004), "particularly when the moving party has expanded the factual record on which summary judgment is sought." Brown v. City of Syracuse, 673 F.3d 141, 147 n. 2 (2d Cir.2012) (citation omitted). This renewed motion is brought within the time scheduled for summary judgment motion practice and will be addressed as a timely motion.

**I. Validity of Retroactive Sublicense**

 ***4** Plaintiffs first move for summary judgment and a declaration that the 2015 Sublicense is valid. It has previously been determined that CINC is not required to obtain permission from Tesseron before issuing any sublicense. Summary Judgment Opinion, 2015 WL 4508334, at *5. Moreover, the Agreement does not bar a retroactive sublicense. After all, the Agreement itself is retroactive and contemplated that CINC could immediately extend sublicenses to all of its current Affiliates, presumably also for retroactive terms, and could extend sublicenses as well to a category of future Affiliates. The defendants contend, however, that federal patent law bars retroactive licenses. It does not, at least in the circumstances that pertain here. To support their argument the defendants rely on caselaw that pertains to co-owned patents and other intellectual property; that caselaw is inapposite.

The basic principles of patent licensing are well established. They begin with the rights that accrue to ownership of a patent. "A patent grant bestows the legal right to exclude others from making, using, selling, or offering to sell the patented invention in the United States, or importing the invention." Morrow v. Microsoft Corp., 499 F.3d 1332, 1339 (Fed.Cir.2007) (citing 35 U.S.C. § 154; 35 U.S.C. § 271). "[The] right to exclude is the legal interest[,] created by statute" and belonging originally to the patentee (or patentees). Id. [6] These interests and rights in the patent carry with them the right to sue patent infringers. 35 U.S.C. § 281. "A patent is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part," Alfred E. Mann Found. For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 1360 (Fed.Cir.2010) (citation omitted), and the right to sue is "one of the most valuable 'sticks' of the bundle." Davis

v. Blige, 505 F.3d 90, 103 (2d Cir.2007) (citation omitted) (copyright).

6   "'[P]atentee' includes the patentee to whom the patent was issued and the 'successors in title' to the patentee. The 'successor in title' is the party holding legal title to the patent." Morrow, 499 F.3d at 1339 (citation omitted).

As with any other property, the full panoply of legal rights and interests attached to a patent may be conveyed to another by transfer or assignment. A limited conveyance of rights may also be accomplished through a license, which may be either an exclusive or nonexclusive license. "[A]lthough all the various rights available under [a] patent are initially held by the named inventor or inventors, they may, as a result of licensing agreements and assignments, become separated and be held by multiple individuals." Alfred E. Mann Found., 604 F.3d at 1360.

An exclusive license "carries with it the right to prevent others from practicing the invention." Morrow, 499 F.3d at 1340. The holder of an exclusive license "comes so close to having truly proprietary interests in the patent," Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1032 (Fed.Cir.1995) (citation omitted), that she is entitled to enforce the patent's monopoly through the courts—but only "through or in the name of the owner of the patent," who ordinarily must be joined in any action. Morrow, 499 F.3d at 1340 (citation omitted).

By contrast, a nonexclusive license, in its barest form, is just "a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities." TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d 1271, 1276 (Fed.Cir.2009) (citation omitted). Nonexclusive licenses may include provisions granting other rights in the patent, including a right to sublicense. Cf. Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821, 826 n. 9 (Fed.Cir.1991).

*5 The freedom to license a patent or to sue for infringement of a patent is more restricted, however, when a patent is held by co-owners. Although each co-owner "is ordinarily free" to sell a patented invention without regard to the wishes of any other co-owner and to license others to do so, the right to license others is limited to the right to grant a prospective license. See, e.g., Schering Corp. v. Roussel–UCLAF SA, 104 F.3d 341, 344–45 (Fed.Cir.1997) (citing 35 U.S.C. § 262). Similarly, a co-owner may not sue for infringement without joining all other co-owners. STC.UNM v. Intel Corp., 754 F.3d 940, 944 (Fed.Cir.2014), cert. denied, ––– U.S. ––––, 135 S.Ct. 1700, 191 L.Ed.2d 676 (2015). This limitation of rights is subject to alteration by contract. Patent co-owners may grant each other "the right to bring suit for infringement of the patent without the other co-owner's voluntarily joining the suit." Schering, 104 F.3d at 344.

The restriction on a co-owner's right to grant a retroactive license arises from two concerns. First, retroactive licensing would undermine the unconsenting co-owner's right to sue:

> Unlike a settlement, which recognizes an unauthorized use but waives a settling owner's accrued claims of liability, a retroactive license or assignment would—if given legal effect—erase the unauthorized use from history with the result that the nonparty co-owner's right to sue for infringement, which accrues when the infringement first occurs, is extinguished.

Davis, 505 F.3d at 103.[7] Thus, "[a] rule permitting retroactive licenses or assignments" could extinguish "one of the most valuable 'sticks' of the 'bundle of rights.'" Id. (citation omitted).

7   Davis, a copyright case, draws heavily upon and applies principles of patent law in reaching its decision because "[l]icenses in patent and copyright function similarly." 505 F.3d at 104.

Secondly, the inability of a co-owner to unilaterally grant a retroactive license promotes predictability and certainty and discourages infringement. As explained by Davis, if a co-owner could unilaterally grant a retroactive license whenever it wished, "one could never reliably and definitively determine if and when infringement occurred, because an infringement could be 'undone' by" one co-owner's grant of a retroactive license; for another,

> one could never know who the pool of authorized users or licensors ... would be at any given time, because a retroactive transfer could always turn an infringer into a potential user or licensor, who would then have the ability to grant his own retroactive

licenses or retransfer his new (retroactive) interest retroactively.

Davis, 505 F.3d at 105. Were retroactive licensing permitted, the court explains,

> [a]n infringer could "buy" his way out of an infringement suit, in which an injured owner may seek enhanced statutory damages and costs... by paying a single co-owner for a license or assigned copyright interest. A retroactive license or assignment that can be obtained from a co-owner not bringing suit, or one willing to settle for a lower price than the co-owner bringing the action, is likely to cost much less than the value of the copyright interest including the cost of litigation. The result is that infringement is encouraged and rewarded.

Id. at 106.

Defendants cite language in Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456 (Fed.Cir.1998), as well as Davis to assert that all retroactive patent licenses are forbidden. Yet these cases do not support that proposition.

The patent owners in Ethicon were co-owners. 135 F.3d at 1466. Moreover, the portion of Ethicon with the relevant discussion relies wholly upon an earlier case whose reasoning was explicitly addressed to co-ownership [8]; moreover, Ethicon was careful to acknowledge that certain "retroactive licenses of patent rights have been enforced" for patents with "sole owners." Id. at 1467 n.8. [9]

[8]   The holding of that earlier case, Schering Corp. v. Roussel–UCLAF SA, 104 F.3d 341 (Fed.Cir.1997), is narrow. Schering holds only that "the grant of a license by one co-owner cannot deprive the other co-owner of the right to sue for accrued damages for past infringement" and that "the rights of a patent co-owner, absent agreement to the contrary, do not extend to granting a release that would defeat an action by other co-owners to recover damages for past infringement." Id. at 345.

[9]   Ethicon has recently been cited for the "principle" that "a license to a third party only operates prospectively." STC.UNM v. Intel Corp., 754 F.3d 940, 945 (Fed.Cir.2014) (citing Ethicon, 135 F.3d at 1467). The discussion in Intel Corp., however, was addressed explicitly to a discussion of co-owners' licensing rights. Intel Corp., 754 F.3d at 944–45.

**\*6** As far as the Davis case is concerned, neither the legal principles nor public policy undergirding the opinion recommend a reading that would indiscriminately ban all copyright- or patent-holders, even sole owners, from voluntarily entering into retroactive license agreements. As the Honorable Robert W. Sweet has explained, "the holding in Davis was a narrow one that does not apply to" unless licensing rights are held by co-owners. Spinelli v. Nat'l Football League, 96 F.Supp.3d 81, 124 (S.D.N.Y.2015). The other cases defendants cite—including a District Court case from this District interpreting Davis—are inapposite. For example, in Waterloo Furniture Components, Ltd. v. Haworth, Inc., 467 F.3d 641 (7th Cir.2006), the court determined that a settlement agreement to resolve a claim for past infringement that was entered after the expiration of a patent was not a license. Id. at 647–48. See also N.J. Media Grp. Inc. v. Pirro, No. 13cv7153 (ER), 2015 WL 1086566, at \*4 n. 6 (S.D.N.Y. Mar. 9, 2015).

Accordingly, the discussions in Ethicon and Davis are properly understood as discussions of the scope of licensing rights in the context of co-ownership, not sole ownership, and not as indications of intent to restrict a sophisticated patent holder's right to negotiate and issue a broad license agreement granting both retrospective and prospective rights. Indeed, any other reading would represent a significant restriction on a patent holder's ability to freely determine by contract any and all exceptions to the right to exclude others from use of her patent.

Moreover, the arguments against retroactive patent licensing have real force only in the context of co-ownership. Determining when and if infringement has occurred is not difficult for a sole owner because the sole owner has the exclusive right to license; past infringement cannot be "undone" by someone with an equal, unrestricted right to license. And the problem of knowing all authorized users or licensors "at any given time" need not arise when sole owners voluntarily grant retroactive licenses. The out-of-control spread of retroactive sublicenses, and hence uncertainty about the number of authorized users, can be controlled by a sole owner, who may impose contractual limitations on the right of

a licensee to grant a sublicense or a sublicense with retroactive effect. In sum, the logic of prohibiting the right to issue retroactive licenses does not apply unless there is a co-owner.

Accordingly, whether a license or sublicense may have retroactive effect depends upon whether the licensor has conferred that right. This is a question of contract interpretation.

Construction of a patent "licensing agreement is solely a matter of state law." Lear, Inc. v. Adkins, 395 U.S. 653, 661–62, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). The Agreement's choice of law clause selected New York's as its governing law. Under New York law, "agreements are to be construed in accordance with the parties' intent," "the best evidence" of which "is what they say in their writing." In re World Trade Ctr. Disaster Site Litig., 754 F.3d 114, 122 (2d Cir.2014) (citation omitted). "Accordingly, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Id. (citation omitted). Thus, "[a]t the outset, the court must determine whether the language the parties have chosen is ambiguous ...." Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc., 716 F.3d 302, 313 (2d Cir.2013). "[A]n omission ... in a contract does not constitute an ambiguity." Jade Realty LLC v. Citigroup Commercial Mortgage Trust 2005-EMG, 83 A.D.3d 567, 922 N.Y.S.2d 37, 39 (1st Dep't 2011) (citation omitted), aff'd, 20 N.Y.3d 881, 957 N.Y.S.2d 280, 980 N.E.2d 945 (2012).

Here, Tesseron executed a retroactive license with CINC. The Agreement, which was executed on dates in mid-January 2006, acknowledges that it applies retroactively to December 31, 2005, and relieves CINC of all liability for importing, using and selling the licensed products both before December 31, 2005 and until the expiration of the Patents. Read as a whole, the Agreement also permits CINC to grant retroactive sublicenses.

 *7  Section 2.02 of the Agreement governs sublicensing. It limits CINC's right to sublicense in two specific ways: CINC may sublicense only to Affiliates, as that term is defined in the Agreement, and may not grant those Affiliates the right to sublicense further. It does not restrict the right to sublicense to a grant of prospective licenses. "[I]f parties to a contract omit terms ... the inescapable conclusion is that the parties intended the omission." Quadrant Structured Products Co. v. Vertin, 23 N.Y.3d 549, 560, 992 N.Y.S.2d 687 (2014). The presence of two sublicensing restrictions and the absence of a provision prohibiting retroactive sublicensing demonstrates that these sophisticated parties chose not to include one. See id. ("[W]here [a] sophisticated drafter omits a term, expressio unius precludes the court from implying it from the general language of the agreement.").

Furthermore, the ability to sublicense retroactively is woven into the fabric of the Agreement. The Agreement extinguishes any liability for past infringement on the part of both CINC and its Affiliates. Section 3.01 of the Agreement extinguishes liability for any claims against CINC "and all of the Affiliates [that] have been made, might have been made or might be made at any time prior to the Effective Date." Indeed, since CINC may issue a sublicense to Affiliates it acquires at any time during the term of the Agreement (as long as later-acquired Affiliates were not major competitors of Tesseron as of the Agreement's effective date), and the Agreement grants such an Affiliate the full measure of rights under Section 2.01, the Agreement necessarily authorizes retroactive sublicenses.

The defendants offer three arguments to support their assertion that the Agreement does not permit a retroactive license and that the 2015 Sublicense is invalid. First, they contend that the parties' choice of an effective date that was some weeks prior to the execution of the Agreement was simply "an administrative detail" and should not be used as evidence that they extended a retroactive license. But, as described above, the Agreement grants retroactive licenses that cover more than just those few weeks between the effective date and the execution dates. The one-time fee licensed a broad swath of historic and prospective activity for both CINC and its Affiliates.

Defendants also argue that the 2015 Sublicense is invalid because it represents an improper attempt to settle a dispute of material fact. The 2015 Sublicense includes several provisions purporting to "remove all doubts as to CINC's grant to CUSA of a full sublicense" in January 2006. Defendants are correct that the 2015 Sublicense cannot resolve the factual dispute over the creation of the 2006 oral sublicense. That factual dispute, however, is mooted by the 2015 Sublicense. The 2015 Sublicense explicitly "grants to CUSA, effective retroactively to December 31, 2005, a fully paid-up non-exclusive sublicense." That grant does not depend in any way upon whether the 2006 oral sublicense exists.[10]

10  Pursuant to Federal Rule of Civil Procedure 56(d), the defendants have requested to depose the signatories of

the 2015 Sublicense about their knowledge of the 2006 sublicense. Because the validity of the 2015 Sublicense does not hinge on knowledge of the 2006 oral sublicense or any of the other circumstances surrounding the new grant that defendants have identified, their request for additional depositions is denied.

Finally, the defendants contend that the 2015 Sublicense, even if valid, cannot encompass the Océ printing presses since the Agreement only licenses component parts and not a complete system. Specifically, defendants point to § 2.03, in which Tesseron waived its right to assert patent infringement claims against any "supplier of Canon and its Affiliates." They assert that the term supplier is ambiguous, and that it could refer solely to suppliers of component parts and as opposed to Océ, which supplied CUSA with complete printing presses. Read in the context of the entire Agreement, however, "supplier" is unambiguous and refers to a much broader range of suppliers.

**\*8** Section 2.03 states that Tesseron "agrees not to assert any of its rights under the [Patents] against any direct or indirect suppliers of [CINC] and its Affiliates including, without limitation, [EFI] for infringement or alleged infringement ... to the extent of the Licensed Products which have been purchased by [CINC] or such Affiliates" during the term of the Agreement. (Emphasis added.) Thus, "suppliers" refers to suppliers from whom CINC or its Affiliates purchase "Licensed Products."[11] The definition of "Licensed Products" explicitly includes "any products [or] systems"— precisely what defendants claim the term "suppliers" cannot refer to—as well as "components." Indeed, the Agreement explains that Tesseron's own patented device is a "system." Accordingly, because § 2.03 unambiguously provides that Tesseron will not assert its rights against any suppliers that sell to CINC and its Affiliates systems that rely upon the Patents, the 2015 Sublicense covers the Océ printing presses that CUSA sold to CSA.

[11] The defendants emphasize that § 2.03 refers to EFI, which is a component manufacturer. But, this reference does not suggest a more restrictive reading of the term "suppliers." The Agreement states that the suppliers included are "without limitation," and the canon of ejusdem generis applies only to "general terms that follow specific ones," not the other way around. United States v. Amato, 540 F.3d 153, 160 (2d Cir.2008).

**II. Patent Exhaustion**

Plaintiffs also seek summary judgment on their claim for a declaration that the Patents are exhausted with respect to the sales by CSA of the licensed products they purchase from CUSA. The parties agree on the underlying legal principle that must be applied.

"Patent exhaustion is a judicially fashioned doctrine." JVC Kenwood Corp. v. Nero, Inc., 797 F.3d 1039, 1047 (Fed.Cir.2015) (citation omitted). "The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." Quanta Computer, Inc. v. LG Electronics, Inc., 553 U.S. 617, 625, 128 S.Ct. 2109, 170 L.Ed.2d 996 (2008). "[B]y exhausting the patentee's monopoly in that item, the sale confers on the purchaser, or any subsequent owner, the right to use or sell the thing as he sees fit." Bowman v. Monsanto Co., ––– U.S. ––––, 133 S.Ct. 1761, 1766, 185 L.Ed.2d 931, 941 (2013) (citation omitted).

Plaintiffs have offered evidence—including purchase orders between Océ GmbH and CUSA and between CUSA and CSA, a customs invoice from Océ GmbH, and an invoice showing delivery to CSA—that CUSA purchased printers from Océ GmbH and in turn sold them to CSA.[12] There is, in short, no dispute that since 2013 the products at issue were "sold" by CUSA to CSA. Accordingly, any subsequent sales by CSA are protected by the doctrine of patent exhaustion.

[12] The exhibits were submitted with plaintiffs' previous motion for summary judgment and have been incorporated by reference into their motion papers here.

Defendants argue that these sales by CSA are not protected by the doctrine since CSA offered to sell the products before it purchased them from CUSA. As explained by the defendants, CSA receives purchase orders from consumers before it orders the corresponding products from CUSA. Therefore, defendants argue, any subsequent sale of printers to CSA are not "authorized" for purposes of patent exhaustion because CSA has already engaged in infringing activity. This argument is misguided.[13]

[13] The arguments regarding patent exhaustion were set forth in the parties' supplemental briefing on the initial motion for summary judgment on these issues, and were incorporated by reference into the briefing here.

The defendants are correct that "[a]n offer to sell is a distinct act of infringement separate from an actual sale." Transocean Offshore Deepwater Drilling, Inc. v. Maersk

Contractors USA, Inc., 617 F.3d 1296, 1308 (Fed.Cir.2010). "[W]hoever without authority ... offers to sell[ ] or sells any patented invention[ ] within the United States ... infringes the patent." 35 U.S.C. § 271(a). Making the offer a separate act of infringement serves "to prevent generating interest in a potential infringing product to the commercial detriment of the rightful patentee." Transocean, 617 F.3d at 1309 (citation omitted).

**\*9** CSA's offers to sell the patented systems did not violate 35 U.S.C. § 271(a) so long as all of the systems it did sell were purchased from CUSA or another licensed entity. Any other result would eviscerate CUSA's license, in particular its retroactive effect. The defendants' argument is premised on its contention that CUSA was not a properly licensed seller of the patented products. Accordingly, since the sales by CUSA were non-infringing sales, these sales exhausted defendants' patent rights in the printers. Any offer to sell the printers was an offer to sell non-infringing printers. [14]

[14] Defendants do not suggest that CSA's offers to sell the printing presses were linked to any sales other than those it had purchased from CUSA. This Opinion does not address a situation in which a seller made offers to sell products for which there had been no initial authorized sale.

Nor does defendants' analogy to Honeywell Int'l, Inc. v. United States, 609 F.3d 1292 (Fed.Cir.2010), support their claim that CSA's offers to sell defeat the doctrine of patent exhaustion. In Honeywell, the court concluded that a party's purchase of a patent after it sold infringing articles did not "retroactively authorize th[ose] earlier sale[s]" and thus retroactively trigger patent exhaustion. Id. at 1304. The Honeywell court did not construe the language of any licensing agreement to determine whether the agreement had granted a retroactive license that would bar infringement claims for subsequent sales.

### III. Covenant of Good Faith and Fair Dealing

Plaintiffs also move for summary judgment on defendants' counterclaim that CINC breached the implied covenant of good faith and fair dealing. That motion is also granted.

"Under New York law, a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir.2007). "This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement," Refreshment Mgmt. Servs., Corp. v. Complete Office Supply Warehouse Corp., 89 A.D.3d 913, 933 N.Y.S.2d 312, 315 (2d Dep't 2011) (citation omitted), that is, the right to receive "the fruits of the[ir] contract." Sec. Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F.3d 807, 817 (2d Cir.2014) (citation omitted). "The doctrine is employed when necessary to effectuate the intentions of the parties, or to protect their reasonable expectations." Gaia House Mezz LLC v. State St. Bank & Trust Co., 720 F.3d 84, 93 (2d Cir.2013) (citation omitted). "Since there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." Tractebel Energy, 487 F.3d at 98.

"The covenant will be breached only in a narrow range of cases." Sec. Plans, Inc., 769 F.3d at 817. "[T]he plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." Aventine Inv. Mgmt., Inc. v. Can. Imperial Bank of Commerce, 265 A.D.2d 513, 697 N.Y.S.2d 128, 130 (2d Dep't 1999). The implied covenant does not, however, "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit," Sec. Plans, Inc., 769 F.3d at 817 (citation omitted), and cannot be used to "imply an obligation inconsistent with other terms of a contractual relationship." Gaia House, 720 F.3d at 93.

**\*10** Defendants argue that plaintiffs violated the implied covenant of good faith and fair dealing by contravening the clear intent of the Agreement's provisions when read as a whole. Specifically, defendants contend that CSA's sales of Océ printers effectively circumvent the Agreement's "implied covenant" that the plaintiffs will not interfere with Tesseron's receipt of royalties from "third-party major competitors."

Defendants cannot succeed on this claim as a matter of law. To establish a violation of the covenant, defendants must show that CINC "destroy[ed] or injur [ed]" Tesseron's right "to receive the fruits of the contract." Sec. Plans, Inc., 769 F.3d at 817 (emphasis added) (citation omitted). Tesseron's "fruit [ ] of the contract" was the up-front royalty payment, which it indisputably received. Through execution of the Agreement, Tesseron did not obtain the right to license third-party "major competitors."

Nor does the Agreement contain the implied covenant suggested by defendants. To the contrary, the Agreement does not restrict either the sellers from whom CINC or its sublicensees may purchase Licensed Products, or the buyers to whom CINC or its sublicensees may sell Licensed Products. The Agreement even protects third-party major competitors against Tesseron's claims of infringement for any sales made to CINC and its Affiliates, whether those sales were made before or during the term of the Agreement. The Agreement also allowed CINC to sublicense later-acquired Affiliates who were major competitors of Tesseron so long as they were not major competitors on December 31, 2005. Accordingly, an examination of the Agreement's terms does not reveal the existence of the "implied covenant" on which the defendants rely. Indeed, the covenant described by the defendants would "imply an obligation inconsistent with other terms of a contractual relationship." Gaia House, 720 F.3d at 93.

## CONCLUSION

Plaintiffs' September 23, 2015 motion for summary judgment on their two claims for declaratory judgment—on the validity of the 2015 Sublicense and the issue of patent exhaustion—as well as on defendants' counterclaim for violation of the good faith and fair dealing is granted.

**All Citations**

--- F.Supp.3d ----, 2015 WL 7308663

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.　　　9